Virgil **HAMAN, Veronica Haman and Joyce A. Haman, Plaintiffs and Appellants,**

v.

**CITY OF SURREY, a municipal corporation of the State of North Dakota; Ferne Sherlock as City Auditor of the City of Surrey, North Dakota, Defendants and Appellees,**

**Dave Senger as County Auditor for Ward County, North Dakota, Defendant.**

Ruth **HAGER, Conrad Koble and Barbara Koble, his wife, Robert Aschenbrenner and Elsie Aschenbrenner, his wife, Donavon Kauffman and Robert Mahoney, Plaintiffs and Appellants,**

v.

The **CITY OF SURREY, North Dakota, a municipal corporation of the State of North Dakota; Mark S. Campbell, Gary Mehrer, Patrick Johnson, Steven McIntyre, Marvin Schilling, Richard Wittmayer, Council members of the City of Surrey, Raymond Volk, Mayor, City of Surrey, Defendants and Appellees.**

Civ. Nos. 870049, 870050.

Supreme Court of North Dakota.

Feb. 1, 1988.

McIntee Law Firm, and Bosard, McCutcheon & Rau, Ltd., Minot, for plaintiffs and appellants; argued by Michael S. McIntee.

Teevens, Johnson & Montgomery, Minot, for defendants and appellees; argued by William Teevens.

ERICKSTAD, Chief Justice.

The plaintiffs, as appellants, are landowners (Landowners) who challenge special assessments levied against their property. Landowners appeal from the trial court's judgment dismissing their complaints against the city of Surrey et al. We affirm.

Landowners protest the special assessments for water and sewer improvements in Surrey, North Dakota. Surrey's population is approximately 1,000. Landowners' property is not developed for commercial or residential use, but lies within the limits of Surrey. Landowners' property is 247 of approximately 640 acres within the limits of Surrey. Divided by U.S. Highway No. 2, Surrey is seven miles east of Minot, North Dakota.

In 1980, Surrey retained Webster, Foster & Weston, as consulting engineers from Grand Forks, North Dakota, to conduct an engineering study of Surrey's water supply. The engineers' report concluded Surrey has a "very definite need to construct a storage reservoir and large watermain to the elevated tank as soon as possible." The report continued: "Surrey is facing serious problems because its growing water demands will soon exceed the capacity of its existing supply." Surrey's city engineer also issued a report which called for the construction of a 250,000 gallon underground reservoir and attendant pumping facilities. Surrey's city engineer concluded the project would improve fire protection, stabilize the water supply, and accommodate moderate growth.

By city resolution, Surrey created a special assessment improvement district and a special assessment commission to apportion assessments. The special assessment commission equated one assessment unit with 75 feet of frontage in the developed part of Surrey. Each developed lot is approximately one-fourth of an acre. Landowners' property was assessed at two units per acre.

Each unit was assessed $212 for the water improvement and $81 for the sewer improvement. Thus, each developed 75 × 150 foot lot was assessed $293 or approximately $1172 per acre; Landowners' undeveloped acres were assessed $424 per acre for the water improvement (two units at $212 each), and $81 for sewer improvement (one unit per acre at $81), or approximately $505 per acre. Thus, based on land area, Landowners' undeveloped property was assessed at approximately 43 percent of the rate of the developed property. The assessments are apparently payable over a ten-year period.

After a two-day bench trial and submission of post-trial briefs, the trial court dis-

missed Landowners' complaints.[1] During the trial, the city of Surrey called upon the former city auditor, a former member of the special assessment commission, the fire chief, and the city engineer to establish the benefits Landowners' land received as a result of the water and sewer improvements. The fire chief of Surrey testified that the fire department receives about nineteen fire calls per year and that approximately one-third of those calls originate within the city limits of Surrey. The fire chief also testified that the water improvement would strengthen the city's fire fighting capabilities.

The city engineer testified that there were eighteen housing starts in Surrey in 1986; that the water improvement would accommodate moderate growth; that Landowners' property "had the ability to get service;" and that, as a result of the water improvement, the building moratorium was lifted. The city engineer added that further water improvements will be necessary if all of Landowners' property is developed.

The former city auditor testified that Surrey placed stainless steel casing underneath Highway No. 2 to facilitate future development of land south of the highway. Landowners whose property is on the south side of Highway No. 2, however, maintained that their property could not be developed profitably because of the cost of boring beneath Highway No. 2 to hook up to the city water lines.

One of the former members of the special assessment commission testified that all the property in dispute was personally inspected by the special assessment commission; that in the commission's judgment all of the property assessed received a benefit; and that certain parcels were "given the leeway for ravines and sloughs...."

The trial court upheld the assessments, notwithstanding its observation that the assessments are "quite high" and that the "[p]laintiffs are paying a substantial por-

tion of the entire costs of the improvements for which assessments were levied." The trial court denied Landowners' motion for a new trial and Landowners have appealed from the judgment only.

■ The critical factual issue during the trial and this appeal is the extent to which Landowners' property is benefited, if at all, by the water and sewer improvements. The essence of Landowners' testimony at trial was that they received little or no benefit from the improvements. Landowners argue the assessments were made in a "fraudulent, oppressive and unreasonable manner" because the benefits accruing to their land by virtue of the water and sewer improvements are not commensurate with the burden imposed by the special assessments.

Landowners call our attention to *Robertson Lumber Co. v. City of Grand Forks*, 27 N.D. 556, 147 N.W. 249 (1914), a case in which this Court reviewed a sewer assessment on a de novo basis. As our standard of review has changed since *Robertson* we think it is important at the outset to clarify our limited review of assessments made by a properly created special assessment district with a properly appointed special assessment commission. We are not a super grievance board. Our function, like the trial court's function, is to assure that local taxing authorities do not act "arbitrarily, oppressively, or unreasonably...." *Soo Line Railroad Company v. City of Wilton*, 172 N.W.2d 74, 75 (N.D.1969). We do not try the special assessment case anew. *Buehler v. City of Mandan*, 239 N.W.2d 522, 527 (N.D.1976).

Deference for decisions of special assessment commissions stems, in part, from the constitutional doctrine of separation of powers. *Cloverdale Foods Co. v. City of Mandan*, 364 N.W.2d 56, 59 (N.D.1985). We have recognized that a special assessment commission is "in essence a legislative tribunal created by legislative authori-

---

1. Initially, Landowners filed two separate lawsuits to protest the assessments. The trial court consolidated the lawsuits for discovery and trial. Landowners then filed separate notices of appeal with the district court, but submitted one appellate court brief and were represented by one attorney during oral argument. We have considered this a consolidated appeal under Rule 3(b), N.D.R.App.P.

ty for the purpose of (1) determining the benefits accruing to the several tracts of land in an improvement district by reason of the construction of an improvement and (2) assessing the costs and expenses thereof against each tract in proportion to the benefit received." *Cloverdale, supra,* at 60, *citing, Hale v. City of Minot,* 52 N.D. 39, 201 N.W. 848 (1924).

In section 40–23–07, N.D.C.C.,[2] the Legislature granted special assessment commissions the authority to apportion assessments according to the benefits each parcel of land receives. *Cloverdale, supra,* at 60. While assessments levied against each lot must be limited to a "just proportion," *Northern Pacific Railway Co. v. City of Grand Forks,* 73 N.W.2d 348, 351 (N.D. 1955), the process of quantifying benefits accruing to each lot inevitably rests on the judgment and discretion of the special assessment commission. There simply is no precise formula for quantifying benefits.

Evidence in the instant suit that Landowners have in fact received the benefits attributed to them is not overwhelming. The water improvement enhances fire protection and facilitates moderate commercial and residential growth. These benefits were not separately valued but they are significant.

After the two-day bench trial, the court requested an appraisal of the value of Landowners' land after the water and sewer improvements were in place. The parties reached a tentative agreement about hiring an appraiser but did not complete the agreement because of the cost of an appraisal. The trial court then announced that its decision would be made without the benefit of an appraisal.

Landowners contend the special assessment commission's decision is premised on a faulty notion, namely, that Surrey is an expanding community with an increasing demand for developable property. Thus, Landowners argue the benefits to their land are based on hyperbolic speculation and that their property will receive no tangible benefit in the foreseeable future.

We heard and rejected a similar argument in *Soo Line Railroad Company, supra.* In *Soo Line,* the plaintiff railroad company contended its property received no benefit from an assessment for street improvements. We responded to the railroad company's argument:

" 'It is natural for the average property owner to resent the burden thus laid upon him, and he easily persuades himself that the thing for which he is asked to pay is a detriment, rather than a benefit, to his land, and ordinarily it is not difficult for him to find plenty of sympathizing neighbors who will unite in supporting his contention. Indeed, the benefits to be derived in such cases are ordinarily not instant upon the inception or completion of the improvement, but materialize with the developments of the future. They are none the less benefits because their full fruition is postponed, or because the present use to which the property is devoted is not of a character to be materially affected by the improvement.' "

*Soo Line Railroad,* 172 N.W.2d at 83, quoting *Chicago, R. I. & P. Ry. Co. v. City of Centerville,* 172 Iowa 444, 153 N.W. 106, 108 (1915).

Surrey introduced evidence that it received requests to develop some of Landowners' property; that there were eighteen housing starts in 1986; and that the old water system retarded city growth. These

2. Section 40–23–07, N.D.C.C., reads in part:

"Whenever the commission is required to make any special assessment under the provisions of this title, the members thereof personally shall inspect any and all lots and parcels of land which may be subject to such special assessment and shall determine from such inspection the particular lots and parcels of land which, in the opinion of the commission, will be especially benefited by the construction of the work for which the assessment is to be made. The commission shall determine the amount in which each of the lots and parcels of land will be especially benefited by the construction of the work for which such special assessment is to be made, and shall assess against each of such lots and parcels of land such sum, not exceeding the benefits, as shall be necessary to pay its just proportion of the total cost of such work, or of the part thereof which is to be paid by special assessment...."

facts, combined with the presumption that assessments are valid, *Reed v. City of Langdon,* 78 N.D. 991, 54 N.W.2d 148 (1952), support the assessments. We are not convinced from the record submitted to us that the taxing authorities acted arbitrarily, oppressively or unreasonably.

■ Notwithstanding the above conclusion, we must consider one other issue which involves the assertion by Landowners that the sewer assessment was certified to the county auditor on October 31, 1985, whereas the protest hearing (before the city council) on the sewer assessments was not held until December 12, 1985. Their contention is that this certification was "approximately 45 days before the residents could even protest those taxes. This is a direct violation of statutory law."

In the trial court in Landowners' motion for new trial, they obliquely, possibly, make reference to this issue in their brief when they say, "In the case at bar, the City Auditor split the certification for the lagoon project into two separate certifications for assessment. This is improper for

the reasons argued in the briefs previously submitted."

Landowners assert at this level, without explaining how they may have been prejudiced by the two certifications, that the trial court's judgment should be reversed.

An examination of the record, which is very sketchy and not pointed out with particularity, seems to indicate that the special assessments were certified to the county auditor, apparently following the hearing contemplated by section 40–23–11, N.D. C.C.,[3] whereas, pursuant to section 40–23–12,[4] the special assessment commission, after the hearing and confirming the list and making changes permitted under section 40–23–11, should have filed the assessment list in the office of the city auditor. Apparently, at the hearing before the special assessment commission, the assessments of all of the plaintiffs in this case, whom we have described as Landowners, were cut in half. Apparently, also, proper notice was published of the hearing before the city council contemplated by section 40–23–13, which should be read in light of sections 40–23–14, 40–23–15, and 40–23–16, N.D.C. C.[5]

3. *"40–23–11. Alteration of assessments at hearing—Limitations.* At the hearing, the commission may make such alterations in the assessments as in its opinion may be just or necessary to correct any error in the assessment list. The commission may increase or diminish any assessment as may be just and necessary to make the aggregate of all assessments equal to the total amount required to pay the entire cost of the work for which such assessments are made, or the part of such cost to be paid by special assessment. No assessment shall exceed the benefits as determined by the commission to the parcel of land assessed."

4. *"40–23–12. Confirmation of assessment list after hearing—Filing list.* The special assessment commission, after the hearing, shall confirm the list and attach thereto its further certificate certifying that the list is correct as confirmed by it. The commission thereafter shall file the assessment list in the office of the city auditor."

5. *"40–23–13. Publication of notice of confirmation of assessment list and meeting for action upon assessments.* The city auditor shall publish at least once in the official newspaper of the municipality a notice stating that the assessment list has been confirmed by the

special assessment commission and filed in his office and is open to public inspection. The notice also shall state the time when and the place where the governing body will act upon such assessment list. The assessment list shall be acted upon by the governing body at a regular or special meeting occurring more than fifteen days after the publication of such notice."

*"40–23–14. Aggrieved person may file notice of appeal.* Prior to the meeting at which the governing body will act upon the assessment, any aggrieved person may appeal from the action of the special assessment commission by filing with the city auditor a written notice of the appeal, stating therein the grounds upon which the appeal is based."

*"40–23–15. Governing body to hear and determine appeals and objections to assessments —Altering assessments—Limitations.* At the regular or special meeting of the governing body at which the assessment list is to be acted upon, any person aggrieved by the determination of the special assessment commission in regard to any assessment who has appealed therefrom as provided in section 40–23–14 may appear before the governing body and present his reasons why the action of the commission should not be confirmed. The governing body shall hear and determine the appeals and objections and may increase or

Landowners have not asserted that they did not have adequate notice of the hearing before the city council, or that the special assessments were not appropriately confirmed by the city council, certified to, and filed in the city auditor's office. It follows from the fact that the taxes were apparently levied pursuant to that confirmation of assessment that the county auditor must have ultimately received the confirmed assessment list. It may be that it was an error on the part of the assessment commission or its secretary, the city auditor, to have certified the assessment list to the county auditor prior to the hearing before the city council, but this error does not appear to us to have prejudiced Landowners, inasmuch as they did receive notice of the public hearing before the city council at which they had an opportunity to be heard, the hearing was apparently held, and the assessments were ultimately confirmed and certified.

For the reasons stated herein, the judgment dismissing the complaints of Landowners is affirmed.[6]

VANDE WALLE, GIERKE, MESCHKE and LEVINE, JJ., concur.

diminish any of such assessments as it may deem just, except that the aggregate amount of all the assessments returned by the commission shall not be changed and no assessments as adjusted shall exceed the benefits to the parcel of land on which it is assessed as determined by the assessment commission."

"*40–23–16. Confirmation of assessment list by governing body—Certifying list—Filing.* The governing body shall confirm the assessment list, and the city auditor shall attach to the list his certificate that the same is correct as confirmed by the governing body, and thereupon shall file the list in his office."

**6.** Inasmuch as Landowners did not appeal from the order denying the motion for new trial, which raised this issue, although obliquely, the issue is perhaps not even properly before us for consideration on appeal.